**DAVIS et al. v. COOK et al.**

No. 2682.

United States District Court, N. D. Georgia, Atlanta Division.

Sept. 28, 1948.

---

See also 55 F.Supp. 1004.

A. T. Walden, of Atlanta, Ga., Oliver W. Hill, of Richmond, Va., and Thurgood Marshall and Edward R. Dudley, both of New York City, for plaintiffs.

B. D. Murphy, J. C. Savage, J. C. Murphy, Ralph Williams and J. M. B. Bloodworth, all of Atlanta, Ga. for defendants.

E. MARVIN UNDERWOOD, District Judge.

This is an action by Samuel L. Davis, a Negro teacher in the public schools of Atlanta, on behalf of himself and of other Negro teachers and principals similarly situated. The petition charges that defend-

ants over a long period of years have consistently pursued and maintained and presently practice the policy, a custom and use of paying Negro teachers and principals in the public schools of Atlanta, less salary than white teachers and principals in the public school system possessing the same professional qualifications, certificates, experience, and exercising the same duties as Negro teachers and principals, solely because of race and color.

The petition seeks a declaratory judgment and an injunction against the Board of Education of the City of Atlanta and its agents to restrain them from continuing this alleged discriminatory policy in violation of the Fourteenth Amendment of the Constitution of the United States.

The defendants, on the other hand, contend that they do not now and never have discriminated against plaintiff or other Negro teachers on account of their race or color, but that the salaries of the various teachers of the public schools of Atlanta are fixed upon consideration of entirely proper factors.

### Findings of Fact.

All the public schools in Atlanta, both white and Negro, are part of one system of schools and the same type of education is given in all schools. All public school teachers and principals in Georgia, including plaintiffs, are required to hold teaching certificates as provided by the State Board of Education. Negro and white teachers alike must meet the same requirements to receive teacher's certificates and are issued identical certificates.

For many years the School Board operated under two salary schedules providing lower rates of pay for Negro principals and teachers than for white principals and teachers. In addition to these schedules, there were also schedules prepared by State authorities fixing the State's contribution to the educational fund, which listed white and Negro teachers separately. These State schedules have listed in the past and still list comparable compensation of Negroes consistently lower than the compensation of white teachers. Payments to the Board under State schedules are used by the Board but do not determine the exact amounts received by teachers since the Board provides additional funds which determine the actual compensation going to them. Under these double schedules of both the Board and the State, discriminatory difference in pay because of race and color was reflected in the salaries paid to the Negroes and resulted in lower pay to them than to white teachers.

In 1942, after the filing of a suit against the Board by one of the colored teachers named Reeves, charging discrimination because of race and color which was subsequently dismissed, the Board abolished its salary schedules by resolution and directed the administration to work out a new single salary schedule which would be free of discrimination on account of race or color.

The resolution provided:

"Be It Resolved, that all salary schedules for the pay of teachers in the public schools of Atlanta are hereby repealed, abrogated and abolished. Teachers now employed in the system will be paid as a minimum at the same rate of pay as they are now receiving until the Board can revise the rates of pay, which will be done as promptly as possible, and upon a basis which will not make any discrimination whatever as among teachers on account of race or color. The Board reserves the right, and expects to exercise it, of adding to the minimum stated above an additional sum to any teacher if it be found that such teacher has, between the time of the adoption of this resolution and the adoption of new rates of pay, been unfairly dealt with for any reason within that period, if any such case should exist.

"A committee consisting of the Board of Education, acting as a committee of the whole, is hereby appointed to make out a new basis for the pay of teachers which will be based wholly on valid considerations and will not discriminate against any person on account of race or color, and will report the same promptly to this Board for action.

"This Board, in taking this action, does not concede that any such discrimination intentionally exists under present schedules, but complaint having been made that such discrimination does exist, deems it wise to abolish the existing schedules and to study

the question anew, to the end that if any such discrimination does in fact exist, it may be promptly eliminated."

As a result, there was worked out a system referred to as the Track and Step System, which was as follows:

High School Principal's Salary Schedule:

| | | | | | | | Study Increments | | | | | | | | | |
| | | | | | | | 1st | | 2nd | | 3rd | | 4th | | 5th | |
| Track | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 175 | 185 | 195 | 205 | 215 | 225 | 230 | 230 | 235 | 235 | 240 | 240 | 245 | 245 | 250 | 250 |
| II | 175 | 190 | 205 | 220 | 235 | 250 | 255 | 255 | 260 | 260 | 265 | 265 | 270 | 270 | 275 | 275 |
| III | 266 | 293 | 300 | 316 | 333 | 350 | 355 | 355 | 360 | 360 | 365 | 365 | 370 | 370 | 375 | 375 |

Salary Schedule for Junior and Senior High Schools:

| | | | | | | | Study Increments Above M. A. | | | | | | | | | | | |
| | | | | | | | M. A. | | 1st | | 2nd | | 3rd | | 4th | | 5th | |
| Track | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 135 | 145 | 155 | 165 | 175 | 185 | 195 | 205 | 205 | 210 | 210 | 215 | 215 | 220 | 220 | 225 | 225 | 230 | 230 |
| II | 165 | 175 | 185 | 195 | 205 | 210 | 215 | 225 | 225 | 230 | 230 | 235 | 235 | 240 | 240 | 245 | 245 | 250 | 250 |
| III | 180 | 190 | 210 | 220 | 230 | 240 | 250 | 265 | 265 | 270 | 270 | 275 | 275 | 280 | 280 | 285 | 285 | 290 | 290 |
| IV | 195 | 207 | 220 | 232 | 245 | 257 | 270 | 280 | 280 | 285 | 285 | 290 | 290 | 295 | 295 | 300 | 300 | 305 | 305 |

Salary Schedule for Elementary Schools:

| | | | | | | | | | | Tenure | | | | | | | | | |
| | Probation 3 years | | | Automatic | | | | M. A. Degree | | Study Increments Above the M.A. Degree | | | | | | | | | |
| | | | | | | | | | | 1st | | 2nd | | 3rd | | 4th | | 5th | |
| Track | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Track 1 | 70 to 120 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 140 | 145 | 145 | 150 | 150 | 155 | 155 | 160 | 160 | 165 | 165 |
| Track 2 | | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 170 | 175 | 175 | 180 | 180 | 185 | 185 | 190 | 190 | 195 | 195 |
| Track 3 | | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 200 | 205 | 205 | 210 | 210 | 215 | 215 | 220 | 220 | 225 | 225 |
| Track 4 | | 131 | 143 | 156 | 168 | 181 | 193 | 206 | 206 | 211 | 211 | 216 | 216 | 221 | 221 | 226 | 226 | 231 | 231 |

Elementary School Principal's Salary Schedule:

| | | | | | | | | | | Tenure | | | | | | | | | |
| | Probation 3 years | | | Automatic | | | | M. A. Degree | | Study Increments Above the M.A. Degree | | | | | | | | | |
| | | | | | | | | | | 1st | | 2nd | | 3rd | | 4th | | 5th | |
| Track | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Track 1 | 65 to 105 | 70 | 75 | 80 | 85 | 90 | 95 | 105 | 105 | 110 | 110 | 115 | 115 | 120 | 120 | 125 | 125 | 130 | 130 |
| Track 2 | | 80 | 90 | 100 | 105 | 110 | 115 | 125 | 125 | 130 | 130 | 135 | 135 | 140 | 140 | 145 | 145 | 150 | 150 |
| Track 3 | | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 150 | 155 | 155 | 160 | 160 | 165 | 165 | 170 | 170 | 175 | 175 |
| Track 4 | | 118 | 126 | 134 | 143 | 151 | 159 | 172 | 172 | 177 | 177 | 182 | 182 | 187 | 187 | 192 | 192 | 200 | 200 |

In addition to the provisions of the schedules, there were other criteria provided, referred to as subjective, for placement or advancement on the schedules. Among them were experience, teaching efficiency, skill and success in pupil relations, professional growth, special talent or skill, personality, et cetera.

This system of rating the salaries of principals and teachers was adopted September, 1944, and resulted in an average increase over the old discriminatory scale of about $8 per month for Negro and of slightly under $2 per month for white teachers.

Plaintiff Davis was placed on the new schedules at the same salary he was receiving and had received for six years under the old double and discriminatory pay rolls. He is still being paid the same basic salary, no change having been made as to him.

Placements on the new schedules were recommended by separate committees, one for white teachers and one for Negro teachers, and approved after some changes by the Superintendent. The White Committee, assisted by Dr. Hunter, former acting Superintendent, was composed of an assistant superintendent, a supervisor and a principal of the school affected. All were white. The Negro Committee, also assisted by Dr. Hunter, consisted of an assistant superintendent, a supervisor and a principal of the school affected. All were colored except Dr. Hunter and the assistant superintendent.

Except for the service of the white members who served on both committees, the work of each was independent of the other.

The initial placement on the schedules is most important since it determines how long it takes an individual to reach his maximum placement where his salary is frozen, unless he is placed on another track in the exercise of official discretion based on subjective qualifications. For example, if a high school principal were placed on Track I, Step 9, at a salary of $235 per month, and not transferred because of subjective qualifications to another track, he would attain his maximum salary of $250 in eight years and could not go high-er. But if placed on Track II, Step 5, he would receive the same initial salary, $235 per month, but would attain a maximum salary of $275 per month in twelve years. Any principal could reach the maximum placement in the sixteenth year after becoming a principal, even if placed on Step 1 on any track, but the track he was placed on would determine what his ultimate salary would be, which would differ greatly according to the track on which he was placed. The maximum basic salary attainable on Track I is $250 per month, while that of Track III is $375.

While the operation of the schedules is complicated and their provisions overlapping, and, as shown by the evidence, little understood by defendants or teachers, they, together with the subjective criteria, are not on their face discriminatory and only become so, if administered in a discriminatory manner. The schedules themselves fix definite and positive standards which affect all alike after they are once placed and while they remain thereon. Discrimination, if any, therefore, must appear in the use of the subjective criteria or because of race or color, either in the original placement on the schedules or subsequent advancement thereon beyond a position which the objective provisions of the schedules would indicate, because the salary of a teacher is determined by his place on the schedule.

Nothing is more important than the instruction and training of youth and every means should be employed to select and retain the most competent and effective teachers. This can not be done by any rule of thumb method nor by consideration of seniority or technical achievement alone. Competency of teachers cannot be and should not be determined by scholastic degrees alone, though they may be helpful in measuring qualification. Teaching ability may vary greatly among those having equal technical training and experience, and honest discretion must be allowed those responsible for their selection.

The subjective criteria, therefore, if applied in a fair and non-discriminatory manner, are not only permissible but highly important and commendable.

We are only concerned in this case as to whether the evidence shows discrimination because of race or color.

For the most part, the evidence consists of statistical tables of objective qualifications and analyses and discussion thereof. The schedules themselves leave little room for weighing subjective qualifications, which are important and should be given due consideration.

So the Court, in considering whether discrimination has been shown, must make wide allowance for statistical limitation and proper official discretion and judgment in weighing the qualifications of teachers.

The sampling method was used in preparing the statistics used in evidence. The master pay rolls of the Board of Education pertaining to the selection of principals and teachers were used in the preparation of the various tables and charts in evidence.

As before stated, there were formerly separate pay rolls, one for white teachers and the other for Negro teachers. These discriminated against Negro teachers because of race and color. Subsequent to the adoption of the new schedules, a single pay roll has been adopted which is constructed by assembling the names, arranged alphabetically, of each school separately and binding all together.

For statistical purposes, sample names were drawn from the master pay roll containing the names of 1,123 white teachers and 356 Negro teachers in the school system. The names of night school, supply teachers, and administrative officers were excluded. The basic pay of teachers is made use of in the consideration of this case, although their actual compensation is about 40% greater due to a so-called "bonus" given because of increased cost of living. The percentage of increase of salaries for all being the same, respectively, the bonus would not affect any pre-existing discrimination.

The personnel cards of the teachers whose names were included in the samples drawn from the pay rolls furnished the data used in most of the tables and charts in evidence.

Professor Blayton prepared the statistics for plaintiffs and Mr. Barnes for defendants. Both are qualified experts in the field of statistics.

Plaintiffs rely on the statistics and analyses furnished by Blayton which they contend show a general pattern of discrimination because of color extending, without removal thereof, from a prior time when there was discrimination to the present.

These statistics are challenged by defendants on the ground that there has been no proper sampling and that the bases of the computations are too narrow and exclude very important elements which go into the selection of a satisfactory teacher. They further assert that there is no fair way of deciding whether or not discrimination exists other than to consider each individual with reference to others with similar qualifications.

With respect to all statistics except those relating to the principals of high schools, which will be considered later, it appears that, although there may be some question as to strict application of technical rules of sampling, and examination and analysis of the method used by Blayton convinces me that any alleged variations were minor and did not materially affect the overall results. Furthermore, if the method used materially and erroneously affected the conclusions derived from the statistics made up from such samples, discrepancies could easily have been pointed out by tables made in accordance with the methods asserted to be correct by defendants, or by an analysis of the whole population of the group studied, as in the case of high school principals, instead of the samples used by Blayton. No such tables were presented by defendants.

I find, therefore, that the Blayton statistics are reasonably correct and present conclusions which, after allowing for considerable margin of error and for reasonable scope in the exercise of a fair discretion based on subjective qualifications of teachers, may be properly used in the consideration and determination of the issue as to whether or not discrimination because of race or color has been shown.

I shall discuss some of the more significant statistics included in the tables and charts put in evidence as illustrative to show the basis of my findings. Specific reference to all is not considered necessary.

I shall first consider the statistics relating to high school principals. There are twelve white high school principals and two Negro high school principals. For comparison, Blayton used only six of the twelve white principals for comparison with the two Negro principals, claiming to have selected the six white principals by proper method of sampling. At the hearing on November 18, 1947, the Court raised the question as to whether a comparison of one hundred per cent of one group with only fifty per cent of the other would give a fair result and requested counsel to furnish tabulations and analyses covering all of the white as well as all of the Negro principals. This was furnished to the Court at the rehearing of the case on July 8, 1948, which had been ordered by the Court to allow both parties to supplement their evidence and reargue certain questions pointed out by the Court. The rehearing was had and counsel were allowed until July 21, 1948 to furnish briefs and tables.

The tables, attached to defendants' brief, which compare the statistics relating to all high school principals, both white and Negro, with those derived from the samples, do not show very material differences, as the following tabulation shows:

Comparing the results obtained from consideration of data derived from consideration of the total white population instead of from the samples selected, there appears a slight difference in age, a greater difference in experience in the Atlanta system and years of principalship, but the years of previous experience appear the same as is also true of the data with respect to State certificates, degrees and study increments. There is a difference of $13.50 per month in the mean pay for 1946 and of $9.07 per month for the year 1947 between the results obtained from samples and those from the whole white population. There was no change with respect to the Negro principals since there were only two and both were considered in the original tabulation.

Comparing the mean basic monthly salaries of the total population of white and colored high school principals for 1946 and 1947, it will be seen that the mean Negro salaries for the two years were $240.50 and $256.50, respectively, and of white principals, $340.50 and $350.60, respectively, showing a difference in the mean salaries of the white principals, of $100 in 1946 and $104.10 in 1947 over the mean salaries of Negro principals.

This wide difference can only be attributable to subjective qualifications or discrimination and not to qualifications set out in the schedules. There was no evidence relating to the subjective qualifications of the two Negro principals which

Summary Statistics (White)

| Population | Age | Years in Atlanta System | Years of Principal- ship (1947) | Years of Previous Exp. | Degree | No. Study Incrs. | Salary Basic Sept. '46 | '47 |
|---|---|---|---|---|---|---|---|---|
| Mean | 55 | 27 | 12 | 5 | M. A. | 4 | $340.50 | $350.60 |
| Sample Mean | 58 | 32 | 17 | 5 | M. A. | 4 | $354.00 | $359.57 |

Summary Statistics (Colored) .

| Mean | 48 | 14 | 4 | 2 | M. A. | 1 | $240.50 | $256.50 |

The mean is used, since there are only two Negro High School principals, and items under the heading "State Certificates" are omitted for lack of space and because substantially the same for all.

would justify the great difference in their salaries from those of the white principals. The evidence was to the contrary.

Defendants have complained that it was unfair to use in the comparison of salaries

the track and step assignments of those principals who, prior to the adoption of the new schedule, because of their long service and achievement of maximum increments, had reached the top of the scale and were receiving the maximum salaries. There were five of these principals, each receiving the maximum salary of $375. To examine into the validity of this objection, comparison may be made between the other seven white principals and the two Negro principals. From an examination of the pertinent tables, it will be seen that with respect to Cornell there is only one white principal who received less than he did in 1946 and in 1947 he was advanced to a higher salary than Cornell. With respect to schedule qualifications of the seven white principals, excluding the five who had attained the maximum position, three have had longer experience in the Atlanta system, one the same, and three less. With respect to the years of principalship, only two had had longer experience, while four had less and one the same. With respect to increments earned, three had more than Cornell, while two had less and two had the same. All the principals held the same kind of State certificates and all held M. A. Degrees, except one white principal who had only an A. B. Degree. With respect to placements on track and step, the tables show that all were placed higher than Cornell except one and he was given the same rating in 1947.

Gideons rated lower than all of the said seven white principals in Atlanta experience, but his principalship was longer than all but three and the same as one. He had no increments, while all of the white principals except one had increments. His monthly salary for the year 1946 was $55 less than the lowest paid to any white principal, and $88 less than the lowest paid in 1947. It was $135.50 lower in 1946 and $150 lower in 1947, than the mean monthly salary of all white principals.

I pass now to a consideration of the statistics relating to high school teachers.

It appears from the tables in evidence that 78.1% of white high school teachers received more than $189 per month, basic salary, and 21.9% of them $189 or less; while 1.5% of the Negro teachers received more, and 99.5% of them less than $189. Like differences are shown in group step placements. For example, 54.2% of Negro teachers are on Track I, 16.6% on Track II, 25% on Track III, and 4.2% on Track IV; while 4.4% of white teachers are on Track I, 12.4% on Track II, 14.3% on Track III, and 68.9% on Track IV. The chart of comparative qualifications of high school teachers shows that 58% of the white teachers have M. A. degrees and 36% have A. B. degrees, while 41% of the Negroes have M. A. degrees and 50% A. B. degrees.

With respect to elementary principals, the tables show that all of the colored principals received less than $214 per month, while only 17.1% of the white principals received such salary, and the balance, or 82.9% received more, up to the maximum salary of $314. Of the Negro elementary school principals, 100% are placed on Tracks I and II, while 16.7% of the white elementary principals are placed on Track II, 25% on Track III, 58.3% on Track IV, and none on Track I. As to their comparative educational qualifications, the charts show that 66.7% of the white teachers hold M. A. degrees, while 80% of the Negroes hold such degrees; 33.3% of the white teachers hold A. B. degrees, while 20% of the Negroes hold such degrees.

The charts relating to elementary school-teachers show that 71.5% of the white teachers received over $139 basic salary per month, but not over $214, while the balance, 28.5%, received less than $140. On the other hand, 95.2% of the Negro teachers received less than $140, while 4.8% received between $140 and $164 per month. With respect to placements, the tables show that 96.5% of the elementary Negro teachers are placed on Tracks I and II, and 3.5% on Tracks III and IV, while 25.6% of the white teachers are placed on Track II, 18.1% on Track III, and 56.4% on Track IV, and none on Track I. The chart comparing academic standing of the elementary school teachers shows that 26% of the white teachers have M. A. degrees, 42% A. B. degrees, 29% two-year normal training; while 5%

of the Negro teachers have M. A. degrees, 73% A. B. degrees, and 21% two-year normal training.

Defendants' experience tables show that 23% of white high school teachers have had five years of experience or less, while 41% of the Negro high school teachers have had five years or less. Similar comparisons between elementary teachers show that 35% of the white teachers had five years of experience or less, while 53% of the Negro teachers have had such experience.

Defendants' tables with reference to study increments show that 87.8% of the white elementary principals and 75% of the Negro elementary principals have earned increments, 36.6% of the white principals and 50% of the Negro principals having earned five increments; that 42.4% of the white elementary teachers had increments, 20% of them having as many as five, while 29.3% of the colored elementary teachers had increments, 16.9% of them as many as five. Each increment entitles the teacher to a $5 per month permanent increase.

With respect to objective qualifications of the teachers, both white and colored, it appears that the white teacher is 4.6 years older than the colored teacher and that 83% of the white teachers have been elected to tenure as compared to 76% of the colored; that the average years of education of the white teachers was 17.83, while that of the Negro teachers was 17.67; that the median total teaching experience in the Atlanta System of the white teachers was 18.5 years and that of the Negroes 15.4 years, a difference of three and one-half years, while their total average teaching experience was 20.2 and 16.8 years, respectively; that the median group step assignment of white high school teachers was Track IV, Step 9, while that of the Negroes was Track I, Step 16, and of the elementary principals, the median group step of the white principals was Track IV, Step 5, and that of the Negroes, Track I, Step 4; of elementary teachers, the median group step of the white teachers was Track IV, Step 3, and that of the Negro teachers, Track I, Step 17.

The median basic monthly salary of white high school principals was $348 and the mean salary, $340.50, while the median salary of the Negro high school principals as well as the mean salary was $240.50. The median elementary white principal's salary was $270 and the mean salary $254.15. The median salary of the Negro elementary principals was $165 and the mean salary $167.73. The median salary of white high school teachers was $210 and the mean salary $198.45, while the Negro high school teachers had a median salary of $150 and a mean salary of $140.65. The median salary of white elementary school teachers was $170 and the mean salary $160.19, and the median salary of the Negro elementary school teachers was $115 and the mean salary $112.38.

The evidence shows a great differential between the pay of white and Negro teachers in favor of the former and also placements on the schedules uniformly and decidedly more favorable to the white teachers far beyond what objective qualifications would justify. It is realized that the results obtained are computed for the most part from tables and statistics based upon samples and not on the whole school population and are not absolutely accurate, but I find that they are reasonably correct and reliable, especially in the absence of a contrary showing, and that even after considerable allowance is made for their incompleteness and for administrative discretion, there is still left so wide a gap between comparative salaries of white and Negro teachers that it cannot be attributed to other causes than discrimination because of color or race. I find as a fact that such discrimination exists.

### Conclusions of Law.

The basis of this action is inequality of treatment due to alleged discrimination by defendants in the pay of school teachers and principals because of race or color.

The acts of defendants as a Board of Education are State action and this Court has jurisdiction of the suit. Gaines, State of Missouri ex rel. v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208.

Plaintiff Davis had a right to bring and maintain this class action on behalf of himself and the Negro school principals and teachers to obtain a declaratory judgment concerning the alleged discrimination against them in the application of the salary schedules. McDaniel v. Board of Public Instruction, D.C., 39 F. Supp. 638.

No administrative remedy for removing inequalities was provided at the time the suit was filed and the provision for appeal to the superintendent, with right to review by the Board, was for an appeal not to a disinterested arbitrator, but to the very agents who made the placements and fixed the salaries in the first instance. So that, even if the remedy had existed at the time of filing the suit, it would not have been such as must be exhausted before appealing to the courts for a judicial determination of a constitutional right. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Mitchell v. Wright, 5 Cir., 154 F.2d 924; Morris v. Williams, 8 Cir., 149 F.2d 703; Mills v. Board of Education of Anne Arundel County, D.C., 30 F.Supp. 245, 248.

The law is well settled that, in cases of this kind, discrimination due solely to race or color, constitutes an infringement of constitutional right, and in a case properly coming within this rule, a declaratory judgment is proper and an injunction should issue requiring equality of treatment. The fact that the salary schedules and rules relating to the selection and placement of principals and teachers, presented in evidence in this case, are fair upon their face, is not a defense if they are, in their practical application, administered in a discriminatory manner. Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Sipuel v. Board of Regents of the University of Oklahoma et al., 332 U.S. 631, 68 S.Ct. 299; Mitchell v. Wright, 5 Cir., 154 F. 2d 924; Reynolds, et al. v. Board of Public Instruction for Dade County, Florida, 5 Cir., 148 F.2d 754, certiorari denied 326 U.S. 746, 66 S.Ct. 53, 90 L.Ed. 446; Mills v. Board of Education of Anne Arundel County, D. C., 30 F.Supp. 245; Alston v. School Board of Norfolk, 4 Cir., 112 F.2d 992.

As pointed out by Judge Chesnut in the Mills case, supra, and also by Judge Parker in the Alston case, supra, a plaintiff in a case of this kind, and the class he represents, "are qualified school teachers and have the civil right, as such, to pursue their profession without being subjected to discriminatory legislation on account of race or color. It is no answer to this to say that the hiring of any teacher is a matter resting in the discretion of the school authorities. Plaintiffs, as teachers qualified and subject to employment by the state, are entitled to apply for the positions and to have the discretion of the authorities exercised lawfully and without unconstitutional discrimination as to the rate of pay to be awarded them, if their applications are accepted." Alston v. School Board of Norfolk, 112 F.2d 992, 996.

The crucial question in this case is whether the very substantial differential between the salaries of white teachers and the colored teachers represented by plaintiff is due to discrimination on account of race or color. I find that it is and that plaintiff is entitled to the relief sought for himself and the principals and teachers he represents. A declaratory judgment and injunction in accordance with these findings and conclusions will be entered.

The Court disclaims any power to fix the salaries of the teachers. That is the right and within the province of defendants. The Court only decrees that the salaries may not, when so fixed, be discriminatory because of color or race.

The Court realizes that a readjustment of salaries will be a difficult task and will require time and patience, so that the injunctive relief granted will be stayed a reasonable time to permit compliance by defendants.

Counsel, after conference between themselves, may submit an appropriate form of judgment, inserting therein for consideration by the Court what they deem to be a reasonable time to allow for the readjustment of salaries, if they can agree thereon.